Hitchcock, C. J.
Various points have been raised and ably argued in this case, but in the view which this court takes ■of the facts, we are relieved from the necessity of examining at any considerable length, the questions of law raised.
It is alleged in the bill that in October, 1845, Allen Cadwallader being indebted to the complainant in the sum of thirteen thousand five hundred dollars, as evidenced by bond, did, in writing, for the purpose of securing the payment of said bond, assign over to Ferdinand Suydam for the use of complainants, five undivided eighth parts of the steamboat “ Belle Zane,” ■conditioned that if said Cadwallader should, on request, pay the said sum of $13,500, then the assignment to be void.
It is further alleged, that on the 3d day of January, 1846, the said Cadwallader, by his agent, applied at the office of the defendant, the Columbus Insurance Company, at their office in 'Zanesville, Muskingum county, to effect an insurance of four thousand dollars on the said steamboat “ Belle Zane,” then on the Mississippi river bound for New Orleans, in the usual man» ner in which boats are insured by that company; the insurance to take effect from the 14th day of the preceding month of He» cember, and to continue for one month. That said application for said policy was so far effected that the said Cadwallader, by his agent, on or about the said 3d day of January, 1846, made an entry of such application upon the books of the company, kept for that purpose, and had paid the premium, by agreeing to give a note for the same, and which the company agreed to accept as payment; and further, said company agreed that the said policy for the sum and period aforesaid, should be issued, and the same be considered for all intents and purposes, to have issued at the date aforesaid, and that the said assured had done all acts required to effect said policy of that date. It ia then stated that said Cadwallader, by his agent, knew nothing of the loss of said boat, nor did the complainants know any *461 thing of its loss until some time after the application and agree ment aforesaid had been made.
It is further stated, that on or about the 25th day of December, 1845, the said steamboat was wrecked and lost upon the Mississippi river, and that the said Cadwallader thereby became and was entitled to have and demand of the company the said sum of four thousand dollars. That on or about the 28th day of March, 1846, the said Cadwallader, by his agent, assigned to the said Ferdinand Suydam, for the use of complainants, all right of action which said Cadwallader had against said insurance company by reason of said risk, etc.
The bill then sets forth the names of the respective owners-of the boat, with the number of shares belonging to each.
. The prayer of the bill is that the defendant may be compelled to issue the policy according to the aforesaid agreement, or that said company may be required to pay the loss, or such-amount thereof as may be found due, and for general relief.
It is unnecessary to state at length the answer of the insurance company. It denies explicitly that any contract was made as stated in the bill. It is admitted that one Perry Smith, as agent for Cadwallader & Co., made an application in writing to Charles Gr. Wilson as agent of the company, on the 3d day of January, 1846, for a policy of insurance on said boat in the-sum of four thousand dollars, but it is denied that the agent ever agreed to take the risk, or issue the policy. On the contrary it is averred that the facts are, that Wilson the agent agreed that if he took the risk, he would take it at two per cent, on the amount to be insured, and that in that event, he would receive a note at thirty days for the premium; but that at the same time he informed Smith that before he could act. in the matter, or consent to take the risk, he must see a letter recently received in Zanesville from a person on board said boat, and that he must see the person to whom the letter in question-was addressed.
While the negotiation was pending, and before the agent had seen the letter or person referred-to, before he had agreed te *462 lake the risk or issue the policy, before the premium note was received or tendered, it became generally known that the boat was lost, and this put an end to the negotiation.
The first question to be ascertained under this state of the ■case, is, whether here was a contract between the parties which can be enforced in-a court of equity. If there was, then other questions raised by counsel must be considered; if there was not such a contract, there is an end of the case. I suppose, in .a contract of insurance as well as in other contracts, there must be an agreement between the parties; and the same evidence will be required to prove the existence of such a contract, as of .any other. It must be such evidence as satisfies the mind, that the parties not only intended to contract, but that they did in fact contract.
The evidence in the present case is not very multifarious. It is contained in two depositions, of individuals testifying to the contract, and of another individual, who is called upon to state the admissions of one of the aforesaid witnesses, when the two were conversing together upon this subject.
The two witnesses who speak directly as to this contract, or pretended contract, are Smith, the agent of Cadwallader, and Wilson, the agent of the insurance company. Neither of them., so far as we know, have any interest in this controversy, but their relation to the parties is such that, by possibility, their feelings may be somew'hat interested. In this respect, however, they stand in the same relation.
Smith states that upon the 3d of January, 1846, he called upon Wilson, the agent of the company, and informed him that he wished to effect an insurance on the steamboat “ Belle Zane,” for one month, from the 14th day of the preceding De •cember, that being the day of the- date of a letter from Charles Bowen, at Smithland, Kentucky, to Charles Bowen & Co., Zanesville, containing information that the boat had arrived at that place, and w'ould leave in a few moments for New Orleans. He -says he inquired of Wilson what the company would charge to insure as aforesaid, for one month, and whether *463 the company would take the note of A. Cadwallader & Co. for the premium, in thirty days. Wilson replied that he would, and that he would charge two per cent.; but that he wished to see James Caldwell, the clerk of Bowen & Co., and the letter above referred to. Witness says he told Wilson that the rate of insurance was greater than he had expected, but that if he concluded to take the insurance, he would call again in an hour. He then went to the office of Cadwallader & Co.; ■concluded to take the insurance; returned to the office of Bowen & Co.; saw the letter from Charles Bowen; took a memorandum of the date and place from whence it was written, and then went to the office of Wilson; showed him the memorandum, and made an application for insurance on the boat for one month from the 14th day of December, for the sum of $4,000; sat down and wrote the application in the book, and asked Wilson if it was written right, and he said it was.
Witness further states, in a subsequent part of his deposition, that he had an interview with Wilson on the 5 th of January, 1846, at which time William Galligher was present. He says that, at that time, he tendered Wilson a note for the premium, and one dollar for the policy; that the note was such as had been agreed upon; that he at the same time demanded the policy, but Wilson refused to accept the note, and one dollar tendered, and also refused to sign the policy. He says that this was all that took place at that time, so far as he can recollect. In answer to a question put to him as to what Wilson said when he made the .written application, and before he left she office, he replied : “I think he said that I could get a pol icy at my leisure.”
A paper is then presented to the witness marked B, and which is attached to the deposition, and he is inquired of whether it is in his handwriting, and he replies that it is. Thinks that it was written in the spring or summer of 1846. Says that he showed it to Wilson, and that Wilson did not *464 disagree with him as to its contents; and he afterwards gave it to Mr. Goddard.
On his cross-examination, the witness says he does not recollect, that in the interview with Wilson on the 5th of January, what, if any, reasons Wilson assigned for not issuing the policy. . Upon being ■ further interrogated, he says Wilson said something about Bowen’s letter, but what it was he does not recollect.
In answer to án interrogatory of defendant’s counsel, as to the reason why he made the additional statement, that he u thinks that Wilson told him he could call and get the policy at his leisure,” he replies, “ because I believe it was correct; I was reminded of this remark of Mr. Wilson by Mr. Convers, one of the plaintiff’s attorneys, who directed my attention to the memorandum — things contained in paper marked B.”
This memorandum, marked B, is a statement of facts with respect to the insurance, made, as I suppose, for the use of the attorney for plaintiff, possibly for the purpose of aiding him in stating the case in the bill. It is not like a memorandum made jy a witness, at the time of a transaction, for the purpose of efreshing his memory at a subsequent period. This memorandum was made months after the transaction and conversation therein referred to. The substance of the memorandum does not vary materially from the testimony of the witness, except in two particulars. In the memorandum, the witness states, towards the close, “ I called in about an hour, and stated I would get her insured for four thousand dollars, and that I had been to C. Bowen & Co.’s store, and had the heading of the letter, dated Dec. 14th, 1845, which I showed him; he then stated to me to make an application in his hook, which 1 did, and then I asked him if all was right; he said it was, and 1 could, get a policy at my leisure.”
This statement certainly places the case in a different point of view from the testimony. In his deposition, the witness says nothing of any statement or request from Wilson, that he should make the application in the book. He says he told *465 Wilson that he had concluded to insure, and then set down and wrote the application in the book. In his deposition he does not say that after the application was written, he asked Wilson if all was right. But merely that he inquired of Wilson, whether the application was written right, and that Wilson replied that it was. In the body of his deposition, the witness says nothing about any statement of Wilson that “ he might call at his leisure and get the policy.” True, in a subsequent part of the deposition, the witness says he “ thinks ” Wilson told him so, and subsequently he states why he thinks so. It is not because he recollects the fact, but because his attention was called to it by-one of the counsel for complainants, and because it is so stated in the memorandum. It is evidently from the memorandum that the witness makes this statement, not from any recollection of the existence of the fact. So far as this statement in the deposition is concerned, it must be rejected.
Taking the deposition of Smith alone, the court might come to the conclusion that here was a contract, but it would be at least somewhat doubtful. There was no payment of any premium, nor any offer of a note for the premium until after the loss became known. Nor is there any thing in the testimony to show, that any time was given to execute the premium note. It is apparent, too, that from the beginning of the negotiation, Wilson was anxious to see the letter from Bowen, and feeling this anxiety, it is not probable that he would agree to take the risk, until he had seen that letter.
The next deposition relative to the contract, is that of Will iam Galligher. He heard nothing relative to the contract at the time it is claimed to have been made. He was present on Monday, the 5th of January, when Smith tendered the premium note and demanded the policy. He says that after the tender was made, there was a conversation between Smith and Wilson, in regard to the insurance on the “ Belle Zane; ” that Wilson admitted “ that all the preliminaries had been agreed’ upon, viz, the amount to be insured, as also the time, and the *466 ■manner'of payment.”. “Reference at the time was made to a letter, which was said to be in the possession of Charles Bowen & Co., which he, Wilson, preferred to see before issuing the policy. He, Wilson, stated that he considered the Belle Zane •as insured, provided there was nothing different in the letter from the representation that Smith made concerning the boat, if there had been any material fact withheld from Wilson’s knowledge at the time the representation was made as to her safety, he would consider the insurance as open for further consideration — this is about the substance of the admission made by Wilson.”
On his cross-examination the witness says all the foregoing “ has reference to the Saturday previous. I do not wish to be understood that Mr. Wilson would have issued the policy on Monday had all the facts represented in the letter referred to, been as Mr. Smith represented, on the contrary he refused to issue it on the ground he had not seen the letter. The news of the loss of the Belle Zane had been received in the meantime.”
The witness further says, that in this conversation Wilson stated, “ that at the time the application was made for insurance, he informed Perry Smith that he would see the letter referred to, in the possession of Bowen & Co., before issuing ■the policy,” and Wilson further stated, “ that he intended to see the letter before he went to dinner, as it was then about dinner time; and on his return from dinner, he heard of the loss of the Belle Zane.
From this deposition we learn what transpired on the 5th day of January, when the premium note was tendered, and the reason assigned by Wilson for not issuing the policy — all of which is forgotten by the witness Smith. But whether the testimony of this witness goes more to sustain the testimony of Smith than it does the testimony of Wilson, which will next be referred to, is, perhaps, matter of doubt.
The testimony of the agent, Wilson, has been taken by the •defendants, and in his deposition he says, that, on Saturday *467 preceding the 5th of January, Smith called at his office in. Zanesville, being the office kept, for the Columbus Insurance Company, at about 11 o’clock in the forenoon, while the deponent was very much engaged in writing a letter. Smith inquired if deponent would effect an insurance on the Belle Zane Deponent inquired where she had been heard from last; and Smith replied, that a letter had been received the day before, by Caldwell, a clerk of Charles Bowen & Co.; that the letter came from Smithland, stating that the boat was at Smithland, Kentucky, on the 14th December, 1845 ; that the boat left next morning, proceeding on her voyage. Deponent informed Smith that he would insure the boat, but that, before he did so, he must see the letter to Mr. Caldwell, and also see Mr. Caldwell himself, and have a conversation with him. Smith inquired the rate, and was informed what it would be. He inquired if the note of A. Cadwallader & Co. would be taken for the premium, and deponent told him he had no objection. Smith • went out of the office, but before deponent had done writing the letter, returned, and told deponent that they wished $4,000 insured on the Belle Zane, to which deponent replied, “ very well.” Before going out of the office, he asked for my application book, which was handed to him, and he made an application in writing, and immediately went out of the office, without giving a note or saying anything about a note for the premium. On the same day, and before having seen the letter referred to, deponent was informed of the loss of the boat. At the time of the written application, deponent did not intend to take the risk, without seeing Mr. Caldwell and the letter, and would not, under any circumstances, have done so. As Smith did not offer the premium note at the time, deponent supposed he so understood the matter. What was then said had reference to the previous conversation, and deponent supposed Smith so understood it. The invariable practice of deponent was, when an application was accepted, to make an entry on the book, of the date, premium and ■ amount. It was not done in this case, because deponent did not consider the matter closed. *468 Deponent considered the matter open for acceptance or rejection, after seeing Mr. Caldwell and the letter.
In a subsequent deposition, Wilson denies that he agreed tc the correctness of the paper marked “B,” and says he told Smith that it was not true that he told him he could “ call and get a policy at his leisure,” and that nothing of that kind was said to him. In this last deposition Wilson further says: “ I do not remember that, at the time the paper was shown to me, anything was said with regard to the conditions, with reference to my seeing the letter to C. Bowen & Co., as preliminary to my issuing tbe policy.”
Now, according to the statement of this witness, there certainly was no contract which can be enforced against the defendants. If there was any contract, he was the agent by whom it was made. He states explicitly that he refused to make any contract, until he should have seen the letter to Bowen & Co.; that he so informed Smith. Smith himself states that Wilson said he must see that letter, but he does not speak of this as having been a necessary condition previous to taking this risk. On the Monday following, in the conversation in the presence of Galligher, this same letter was referred to, and the reason assigned by Wilson for not issuing the policy was, that he had not seen the letter. If Wilson can be credited, it was certainly never his intention to take the risk, until he had seen the letter. Probably Smith might have understood the business differently. But before a contract can be enforced, the minds of the parties must have met upon it. There must be an agreement.
Now this is all the evidence which we have directly upon this point. To say the least, it is left doubtful whether there was, in fact, a contract. In truth, looking to the whole testimony, we do not believe there was a, contract, Such being the opinion of the court upon this question, it is unnecessary ta look further into the case.

The lili is dismissed.