(Court of Common Pleas, Franklin County)

C. R. REMINGTON & SON, Plaintiff, v. THE CENTRAL PRESS ASSOCIATION COMPANY, Defendants. et al.,

---

1. A corporation "known to be insolvent" cannot, legally mortgage all of its property

to secure a pre-existing debt of one of its creditors, if its purpose was to give a preference to that creditor, and not to obtain an extension of credit, although, it was, "in possession of its property and in the active prosecution of its business" and "intended to continue therein, unless prevented by other creditors." The mortgage was in the nature of a general assignment, made in contemplation of insolvency and with intent to prefer one creditor over others. It was, also, made with intent to hinder and delay its other creditors in the collection of their claims.

2. What is a preference of one creditor over others defined.

3. To make the reservation of a title to personal property which has been sold and delivered to the buyer valid, in favor of the seller, against subsequent purchasers, etc., that reservation, or condition, must be evidenced by a writing signed by the purchaser, a statement of the amount of the claim verified by the seller or his agent must be endorsed on that writing, and, then, either the original of that writing and of the verified statement endorsed thereon, or a copy of both of them, verified as such, must be deposited with the clerk of the township, or filed with the county recorder. A deposit or filing of a copy of the writing evidencing the condition with a verified statement of the amount endorsed thereon is not a substantial compliance with the requirements of the statutes. (82 Ohio Laws p. 23.)

STATEMENT.

July 14th, 1894, The Central Press Association Company, a corporation, executed a cognovit note to the Remington Paper Company for $17,168.92, and at the same time, to secure its payment, executed a chattel mortgage, the mortgage covering substantially all the property owned by it. It was then a "going concern." Its debts were then equal to, or greater than, its assets. Weeks, the agent of the Remington Paper Company, who procured the cognovit and mortgage, then knew the financial condition of the Press Association. He also knew that Parsons & Co., creditors of the Press Association, were pressing the latter for the payment of their claim, and that was the reason he insisted on the execution of a cognovit and chattel mortgage to his principals. Prior thereto he had agreed with the agent of Parsons & Co., that neither of them should take a prefered lien.

August 19, 1893, the Press Association Company executed a cognovit note to Cole, Trustee another creditor, for $14,759.05; and December 29, 1890, a like note for $200 to J. R. Tingle. July 23, 1893, The Remington Paper Company, and Tingle assigned their notes to C. R. Remington & Son, the plaintiffs. May 3rd and 4th, 1894, respectively, judgments were obtained on the cognovit notes so executed to the Remington Paper Company and Cole, trustee, and executions issued thereon were levied on all of

the tangible property of the execution debtor.

On May 4th, 1894, on the application of C. R. Remington & Son, assignees of the Remington Paper Company, a receiver was appointed for the Press Association.

Parsons & Co., The Watertown Paper Company, and Morrell & Co., defendants, on September 19th and November 10, 1894, respectively; filed cross-petitions, under Secs. 6343 and 6344 of the Revised Statutes, assailing the validity of the said chattel mortgage and cognovit note.

The attorneys in this case being familiar with its details, its history is omitted. It is here upon exceptions to a Master Commissioner's report.

Whether relief can be spelled out, under the evidence, to Parsons & Co., The Watertown Paper Company and Morrell & Co., on the ground that the chattel mortgage given by the Press Association Co., to The Remington Paper Company was made with intent to hinder and delay them in the collection of their claims seems doubtful.

But I think they are entitled to the relief upon the other ground, that the said mortgage was made in contemplation of insolvency with the intent to prefer the mortgagee, and, therefore, partakes of the nature of a general assignment inuring to the benefit of all the creditors of the mortgagor. In the case of private corporations, as in that of natural persons, any conveyance or disposition of its property, in violation of law, and if fraud of existing creditors, is void as against the latter. Whether such a conveyance or disposition of the property by it, when it is impugned as a violation of the leading provision of Section 5344 of the Revised Statutes, is fraudulent must be tested by the same rules and principles which are applicable when the question arises in respect to conveyances made by natural persons.

But, it is also true, as we are instructed by the best judicial authority, that corporations are disabled in relation to the disposition of their assets, to a greater extent than natural persons when they endeavor to prefer their own creditors.

The only doctrine that commends itself to one's moral sense is that which makes the assets of a corporation a trust fund for its creditors, and, which, "when the corporation becomes insolvent, or when its affairs reach such a state that its stockholders or directors find themselves obliged to deal with its assets in view of its approaching suspension," or dissolution, forbids them to deal with its assets in view of its approaching suspension," or dissolution forbids them to deal with such assets for particular creditors whom they desire to pay or secure in preference to others.

The essence of the wrong is, that they then use property which equitably belongs to all creditors, to pay or secure a few.

Natural persons are not controlled by any such rule. Preferences made by such a person are upheld even when the purpose is to

thwart and fetter a creditor, whether he be a belligerent or a peaceable creditor.

But, even in such cases, equity judges, in some jurisdictions, have decided that the creditor will not be permitted to make use of his debt for any other purpose than his own indemnity, and that, if he oversteps that line and incorporates into his contract stipulations which have the effect of shielding the debtor's property from his other creditors, delaying them in the collection of their claims, a court of equity will stigmatize it as fraudulent.

A profound legal thinker has demonstrated that there is not even any analogy between a natural person and a corporation in regard to fraudulent conveyances. An insolvent individual may turn over his property to some of his creditors whom he prefers. By doing this he hinders and delays his other creditors, "and yet he merely hinders and delays them." The hindering and delaying are merely incidents of the preference, as our Supreme Court has apologetically put it. That is one of the agreeable images of logic.

The insolvent individual, by preferring one creditor, does not, by that act, annihilate himself; "he still lives;" "and he may', as the greatest corporation author says: "and often does, get on his feet again, and acquire property and discharge his previous obligations."

But with a corporation it is different.

When it becomes insolvent, and ceases to prosecute the end of its creation, and divests itself of all its property, it dies; "it destroys itself, and becomes, ipso facto, dissolved." After that it can not have anything more for its unpreferred creditors, and never will have. Having exhausted all its assets in giving a preference to some creditors, the others are always remediless. A corporation is, in one respect, in the same situation an individual would be who had committed bankruptcy, and, by the benevolence of the bankrupt law, had been discharged from any further liability for his debts, when he surrendered his property for the benefit of his creditors. By law he is discharged; by the operation of the natural laws of its existence, the corporation, is discharged.

But no bankrupt or insolvent law ever allowed an insolvent debtor to assign his property for the benefit of certain preferred creditors, postponing the others, and then discharged him from all future liability for his debts. Yet that is just exactly what corporations could do, if the doctrine denying their rights to prefer some creditors, is not upheld. They could deliver their property to the preferred creditors, their favorites, then legally die, leaving the rest utterly without relief.

5 Thompson Corporation Sec. 5 497.

In the Rouse case (46 Ohio St., 493,) the Supreme Court did not apply this doctrine in full, but limited its application to a case, where the corporation had become insolvent, and had ceased to prosecute the objects for which it had been created, having, by mort-

gage, preferred some of its creditors whose antecedent debts were secured by mortgages.

The expression of an opinion on the question, whether a corporation, which was a "going concern," and was, in good faith, prosecuting its business, could "borrow money, or contract, or procure an extension of other bona fide indebtedness, and convey or pledge the corporate property in security thereof," was withheld.

Has not that court since, either expressed or declared, or at least, strongly and plainly intimated, that the doctrine has as forcible application to a case where the corporation is a going concern? Why should such a corporation have any more right to prefer some of its creditors than one that is in the agonies of dissolution? If its assets are a trust fund for the benefit of all its creditors, what right has even a solvent corporation to prefer one of its creditors, when the assets are not sufficient to pay all?

If it was done by a mortgage which covers only part of its property, leaving enough to pay all the rest; or, if it covers all the property, and yet the property is worth enough to pay all, of course such a mortgage would be valid. But it is an abuse of terms to say that there is a preference in such a case.

In the Damarin case (47 Ohio St., 581,) the corporation was one that was "known to be insolvent;" but it was, "at the same time in the possession of its property, and in the active prosecution of its business,' and intended "to continue therein, unless prevented by other creditors.' Such a corporation, it was decided, could legally mortgage its property to secure a pre-existing debt, if the object was simply to obtain an extension of credit, and not to give a preference to one creditor over another.

It is not a plain implication of this decision that, if the purpose of the corporation had been to prefer one creditor over another, the mortgage would have been pronounced invalid? Is not that plain implication just as much a part of the decision, and just as much a part of the declared law of the case, as that which is expressly stated? Affirmative answers to these questions, it seems to me, are obvious.

It is true that the court did not go so far as to say that a solvent corporation could not prefer one creditor over another. This question was not made.

But the court does, in the way pointed out, by plain implication, distinguish a corporation that is insolvent, and yet is a "going concern,' from one that is both insolvent, and unable to actively prosecute its business; and, in the opinion, it is said that transactions between an insolvent corporation and part of its creditors, when the insolvency is known to exist, ought to be closely scrutinized by a court of equity, and that they should not be suffered to overthrow "the equitable provisions of the statute, applicable to the dissolution and winding up of insolvent corporations," by the adoption of any "mere devise or form of proceeding"—that agreeable image of legal sanctity

so frequently adopted to cover up fraud

There the court was, evidently, adverting to a corporation that was merely insolvent, and not necessarily one that had ceased to prosecute the objects of its creation.

Manifestly the court meant to announce the rule, that a corporation which is insolvent, and yet a "going concern," can not competently make a mortgage which secures a pre-existing debt of one creditor, when the object is to give him a preference over the other.

I have studied that decision in vain, if that is not its meaning.

As to the proof in this case, and its sufficiency.

That the Central Press Association was, on July 14th, 13893, insolvent, although then, and for nine months thereafter, a "going concern?" is not a debatable proposition. The proof irrefragably establishes its truth. Its debts were not less than $50,000, being more than its property was worth; and, during the subsequent nine months it was unable to pay as much as eight per cent of its debts. The agent of the Remington Paper Company, or Remington & Co., whichever it may be, knew this to be the fact, as well as the manager of the Press Association Company did. He also knew who the creditors were. The proof does not show that the object of executing the chattel mortgage to Remington & Co., was to obtain an extension of credit. I say this, because there is nothing in the chattel mortgage, or the cognovit note—not a syllable of stipulation which provided that the Press Association was to have any definite additional time in which to pay the debt to Remington & Co. If extension of credit had been the object, experience teaches that an express stipulation would have been made for it. To leave that to be established by verbal testimony would open wide the doors to the easy admission of fraud. It would leave the important rights of other creditors to depend upon the coloring which might be given to a past transacation by the verbal testimony of witnesses, after the event had disclosed to the preferred creditor the form and nature in which it was for his interest to portray the transaction.

The testimony conclusively shows that the agent of Remington & Co., knew that Parsons & Co., were pugnaciously pressing the Press Association for the payment of its claim. One of the Parsons swore that Weeks agreed that no preference should be sought by either of them.

Wendell, in his letters, frequently threatened both Parsons & Co., and the Watertown Paper Company, that, if they constrained the Press Association to pay their claims, that a preference would be given to a creditor who had been lenient, and that the Press Association would be thrown into the hands of a receiver. This lenient creditor, the circumstantial evidence shows, was the Remington Paper Company.

Wendell's declarations alone, or the whole evidence considered together, demonstrates that the purpose, the intent, of the Press Association Company, as it was represented and reflected by Wendell, in the execution of the chattel mortgage, was to prefer a favorite creditor, the Remington Paper Company.

Was it necessary that the Remington Paper Company should have participated in that purpose? I will not decide, but assume, that it was necessary.

There is no doubt about the applicable law, if it did participate.

In Webb v. Brown (3 Ohio St. 256) it was said that a preference of one creditor by mortgage, given by an individual debtor, and "made with the very purpose known to the creditor, of defeating the claims of another, would be void, notwithstanding a full consideration were paid. The doctrine is too reasonable to be doubted."

In another place, in the opinion (page 261,) it was said that a preference of one creditor by mortgage, given by an individual debtor, and "made with the very purpose known to the creditor, of defeating the claim of another, would be void, notwithstanding a full consideration were paid. This doctrine is too reasonable to be doubted."

In another place, in the opinion (page 261,) it was said that in every case such an arrangement would be a fraud in the maker of the mortgage, and in ninety-nine out of every one hundred cases, "it would be equally fraudulent in the creditor so favored" by him.

The last time Wendell was on the witness stand, his evidence being on next to the last page of the transcript, speaking of some letter to the Watertown Paper Co., he made this monumental statement: "Prior to this statement, however, Mr. Weeks knew the Parsons Paper Company were going to sue for their claim, hence their demand for immediate action in the execution of the note and mortgage." Then this question was propounded to him: "Mr. Wendell, did you mean by this, that the note and mortgage to the Remington Paper Company were given at that time for the purpose of preventing, or interfering with, the threatened action of Parsons & Company?" His answer was: "Yes sir."

It is significant that this testimony of Wendell's was not denied by Weeks. True Wendell is not a man without a halo, if Mrs. Landis' testimony be true, as was argued in this case. But I see no reason for disbelieving Wendell's testimony. Certainly, since he was not contradicted, he must be credited.

And even if it had been denied by Weeks, the circumstances established by the evidence, which show that Weeks knew the purpose was to give his company a preference, and that it was to obstruct Parson & Co. in the collection of their claim, are abundant.

It was argued, however, that the admissions of Wendell are not binding upon the Press Association Co. That is pushing ceremony to a wild length.

The rule that a corporation can only commit fraud by a resolution, or motion, could not be endured. The heathful rule is, that corporations are capable of committing fraud by agents, and if they are committed within the general scope of their agency, the corporations are answerable for the consequences. If their agents can commit fraud, their admissions of the commission of the fraud are manifestly competent evidence against the corporation. This is certainly the law.

But there is another consideration. For several year, courts of equity have been looking through the corporate form of corporations and dealing with the controlling majority of stockholders, and they have been doing it with increasing frequency and openness. When one person, or a few persons, own practically all the stock, they will be, and they have been, treated as substantially the corporation. Wendell owned according to one witness, about 90 per cent. of the stock of the Press Association Company. The most of the stock which was not in his name was held by what one of the counsel called "dummies," who were ser vicable as creditors. The acts and admissions of Wendell, for this reason were, in a most intense sense, the acts and admissions of the corporation. The corporation was only the form, the shadow; the substance was Wendell.

Recurring to the question, whether the object of executing the chattel mortgage was to obtain an extension of credit, it may be observed that Weeks said he agreed that his company would avail itself of the cognovit and mortgage, if the other creditors would let the Press Association alone. That fact is utterly inconsistent with the hypothesis that an extension of credit was the object.

Summing up my impressions and understanding of the testimony, it conclusively proves that the object and purpose of making the chattel mortgage was to give a favorite creditor, the Remington Paper Company, a preference over the others, and that it was not to obtain an extension of credit from the latter, and, further, that the Remington Paper Company participated in that purpose.

My judgment is that the mortgage is in the nature of a general assignment, made in contemplation of insolvency, and with the intent to prefer the Remington Paper Company. It is a fraud upon the other creditors, and the architects and builders of the fraud were the Central Association Company and the Remington Paper Company. I do not mean by this that it was a moral, an intentional, fraud, but the operating upon the facts, stamps the transaction as fraud. It is a legal fraud.

"Being merely a voluntary mortgage, as the court said in the Rouse case, "to secure a pre-existing debt without other consideration," the plaintiff can not prevail against the rights of the corporate creditors. Lewis v. Anderson, 20 Ohio St., 281."

The chattel mortgage, in question, covered substantially all of the property belonging to the Press Association Company. Its execution and the execution of the cognovit note to the Remington Paper Company constituted one transaction, and, therefore, the cognovit note must be put down with the mortgage, both sharing the same fate.

Since all the property embraced in the mortgage was, on the 14th day of July, 1893, impressed with a trust, by the execution of said mortgage, in favor of all the creditors, and since it continued thereafter to be subject to such trust, it is obvious that those creditors, Cole trustee and others, who obtained judgments in May, 1894, did not acquire preferential liens on the property in consequence of the executions issued on their judgments and levied thereon. The property was not open to levy; the levies were nullities. Floyd v. Smith 9 Ohio St., 546. Bloomingdale v. Stein, 42 Ohio St., 168.

The next question is : Is Ostrander's mortgage lien valid and a preferred lien? The right of the cross-petitioners to impeach this mortgage was, in an elaborate argument, denied. There must be a misconception of the rights of those creditors, and of the relations existing between them and Ostrander, notwithstanding the industry and ability manifested in the argument. It is true, a subsequent creditor, one whose claim was contracted after the mortgage was executed, would not be allowed to challenge the mortgage lien; but I am unable to perceive why an existing creditor, one whose claim was in existence before the mortgage was executed, should not be allowed to impeach it. Such a creditor has an interest in the assets in the trust fund, which is held for the benefit, not of some, but of all, the creditors. If, after this claim is made, the corporation should execute a fraudulent, or otherwise void mortgage, the law would be very imperfect, if he could not have some court review the transaction and set it aside.

As has already been said, it is just as true of a corporation as of a natural person, that any conveyance of its property, without authority of law, and in fraud of existing creditors, is void as against them.

Void corporate mortgages may be impeached, not by subsequent, but by an existing creditor whose interests are injuriously affected by them; and they are subject to collateral attacks by such creditors. That is the doctrine, as I understand it, though I have not time to search for the authorities.

The proof clearly discloses that Wendell conceived and formulated a plan for the Press Association to issue a large number of bonds payable in six years. The creditors were to be invited to accept them in lieu of their claims. Some were to be sold and the proceeds used to promote the objects of the corporation. But it was expressly understood that they were not to be issued, unless all the creditors would accept them, and unless the Remington Paper Company would also release its prior chattel mortgage The

proof is mathematically certain on this proposition. And it is equally certain, according to the testimony, that Ostrander knew this was the plan. His denial does not avail anything; for, in Wendell's letter of December 8th, 1893, (Exhibit 20 )he was informed of all this The letter, it is true, is written in a rather flabby and loose style, but it contained enough information to advise Ostrander that the bonds and the mortgage were only to go out and take effect on the conditions 1 have named. The last sentence in the letter is illustrative and reads:

"Of course it is understood that the bonds will not be issued unless the RemingtonPaper Company will release their mortgage."

That was explicit enough.

Here was, a corporation daily approaching nearer to its end, hoplessly insolvent. All of the creditors were entitled to share equally in its assets, which were dedicated as a trust fund for their benefit. In the judgment of the law, the officers of the corporation, including Wendell, were the trustees of all the creditors. It certainly indicated a very degraded sense of justice, if Wendell, a trustee of all the creditors, and Ostrander, one of the creditors, thought they could go off into a corner, as it were, and have the former, in flagrant violation of his trust duties, issue a lot of bonds and a fortifying mortgage to Ostrander, thereby preferring him over the other creditors.. 1 am not prepared to say that that was their thought and purpose. But the effect of their action, in contemplation of law, was to make the issuance of the bonds and the execution of the mortgage a fraud upon the other creditors. Wendell being a trustee for all of them, and the plan and agreement having been that the bonds should not be issued unless certain conditions existed, he had no right to participate in the issuance of the bonds and in the execution of the mortgage, in the absence of those conditions, notwithstanding Ostrander agreed to run the risk of their validity. Morally, Wendell's purpose may not have been fraudulent, but the law makes is a fraud. The agreeable image of legal sanctity which it was made to assume can not avail anything.

Ostrander's mortgage was, therefore, void for the same reason that the chattel mortgage of the Remington Paper Company was declared void, and, also, for the further reason, predicated of the execution liens of Cole, Trustee, and others, namely, that the property embraced in it having been previously impressed with a trust in favor of all the creditors, because the first chattel mortgage was in the nature of a general assignment, Ostrander could not acquire a preferential lien by his mortgage.

It has already been stated that the execution liens of the said trustee and other judgment creditors are not preferential in their character. The postponement of these liens to the claims of Parsons & Co., The Watertown Paper Co., and Merrell & Co. can be vindicated upon another consideration, and

that is, that the cognovit notes upon which the judgments were based were given in contemplation of insolvency and with intent to prefer those creditors.

It is pertinent to add that the reason for the conclusion, that the Press Assocition Co. was, on July 14th, 1893, insolvent, is that it was unable to pay its debts in the ordinary course of business as they matured, the evidence having conclusively proved that it was in that condition at that time. The claim that it might ultimately have paid its debts is not an influential argument. The law draws no distinction between the insolvency of a person by reason of his being unable to pay his debts in the ordinary course of business as they mature and his inability ultimately to pay them. If a person is in the condition of not being able to pay his debts in the ordinary course as they mature, he is, in the judgment of the law, insolvent, and is subject to all the insolvency. It was not necessary to prove that the Press Association Company and the Remington Paper Company, at that time, contemplated for the former, insolvency proceedings. Nor was it material that Wendell then believed its property exceeded in value the amount of the debts, and expected ultimately to pay all of them without such proceedings. The evidence having established the fact, that the Press Association Company executed the mortgage with a view to give a preference to the Remington Paper Company, (2.) that the former was then insolvent, (3.)that the latter had reasonable cause for believing that there was such insolvency, and (4. that the chattel mortgage was given with a view to such a preference, the chattel mortgage was made in violation of the statute. Knowledge of actual insolvency possessed by the Remington Paper Company was equivalent to knowledge that solvency was contemplated.

As to what constitutes giving a preference see, in Re George, 1 Low. 409-411, Fed. Cas. 5325; Whipple v. Bond, 164 Mass., 182, 41 N. E. 203.

When a person is unable to pay his debts in the ordinary course of business, there is a hazard, not only that his creditors will not obtain what is due to them when it should be paid, but that they will finally lose all, or a·part. of their dues To secure one of them, under such circumstances, is giving him a preference over the unsecured creditors All the preference that a person, knowing himself to be insolvent, need intend, in order to bring the case within the purview of the statute, is security against the risks of delay and loss which necessarily results from his condition. The fact that he then hopes and expects that the other creditors will ultimately be paid in full does not take away the preferential character of the security. It is not security against an expected loss, but against the risk of loss, when he is insolvent, that establishes the preference.

Doubt whether relief should be given against the Remington chattel mortgage, on the hypothesis that it was made with

intent to hinder and delay the cross-petition-ing creditors, was, on the first page of this opinion, expressed. Further thought has convinced me that relief might be awarded on that branch of the cause of action. The circumstances of the case, as proved, or the declarations of Wendell in his numerous letters to Parsons & Co. and the Watertown Paper Company, point, with almost compelling force, to the conclusion that The Central Press Association Co. did, by the execution of that mortgage, mean to hinder and delay, until a more convenient season at least, the collection of the claims of those creditors, who refused to accomodate it, by frequently deferring payment of them.

A purpose to hinder is as fatal as a purpose actually to defraud. A transfer of property with intent to delay the payment of a debt is condemned by the statute, and by the common law, no less than a transfer into which the element of actual fraud entered McConnell v. Sherwood 85 N. Y., 522, 530.

When the natural and necessary effect of the transfer is to postpone the creditor, even for one day, in the enforcement of his demand, it is obnoxious to the statute. Warner v. Lake, 14 N. Y. Supp. 10, 12.

Upon further reflection I think there is enough evidence in this case to warrant the inference of a purpose, characterizing the acts of executing the chattel mortgages and the cognovit note to Cole, Trustee, to delay the creditors named who refused to treat the Press Association as leniently as it desired, in view of the hard times prevailing in the business world.

The evidence which rebuts this inference is feeble and inadequate. Nor is the whole evidence so conflicting that it would authorize conflicting inferences to be deduced by different minds.

The validity of the claim of Hoe & Co. is, also, involved in this case. Certain property which was used in the business of The Central Press Association Company was conditionally sold to it by Hoe & Co., they retaining or reserving the title thereto till the purchase price should be paid.

The only question is, whether Hoe & Co. complied with the recording statute. The objection which was argued goes only to the form of the contract; and, if I could content myself with deciding the question thus raised, I would have to overrule it, because there is no merit in it.

But there is more substantial objection to the claim. The statute in relation to conditional sales, just like that in regard to chattel mortgages, must be substantially complied with by those "who seek to avail themselves of its provisions." Just as a failure of the chattel mortgagee to comply with the requirement of the chattel mortgage statute is fatal, so is a failure of the seller, &c., of personal property to which the title has been retained, to comply with the other statute named, fatal.

The decision in Cross v. Carstens, 49 O. S., 548, and the cases there assembled, on page 575, are illustrative of the way our Su-preme Court has held parties to a strict compliance with the chattel mortgage statute; and they are instructive in this case.

The statute requires that, when the copy of a mortgage is filed for record, there must be an original affidavit, made by the mortgagee attached, and not a mere copy of the original affidavit. Therefore, the court decided that, when it was necessary to file with the recorder and also with the township clerk, filing a copy of the mortgage and of the affidavit with either of them was not a compliance with the statute; and the court observed that they were not dealing with the question of form, although it seems so to the uninitiated.

The conditional sale statute requires the condition in the sale to be evidenced by a writing. It also requires a statement showing the amount of the claim, and verified by the seller  *  *  *  *  or his agent, to be endorsed on that writing. Next it requires, either that the writing with the endorsed statement, or a verified copy of such writing and endorsed statement, shall be deposited in the proper place for record. All of these things had to be done by Hoe & Co. to bind subsequent purchasers, creditors, etc., with constructive notice of the contract and its condition.

The statute is carelessly worded; some essential words are omitted, making it necessary to supply them in the work of liberally interpreting the statute; but this seems to be the meaning of the statute.

Was there a substantial compliance with its requirements by Hoe & Co.? The condition was evidenced by a writing. The Master did not err in overruling the objection on that point. But was the verified statement, which the statute intends shall be made, endorsed on it? It seems not. It is not pretended that there is any proof showing that such a verified statement was endorsed on the original writing which evidenced the condition. But does not the statute require that very thing to be done? It is not claimed that the original writing and a verified statement thereon were deposited for record; it was only a copy of the former a copy verified by Col. James Watson, that was filed for record.

In his affidavit, for the first time, so far as the evidence discloses, the verified statement showing the amount due, appeared. The paper filed in the Recorder's office fails to show that the statement, the verified statement, was ever minuted on the original writing evidencing the condition. But does not the statute require that to be done?

No attempt was made to put on record the original writing evidencing the condition, and its endorsed, for accompanying, verified statement. That was one way of making the record.

It was, I repeat, the other mode which was sought to be adopted. As I construe the statute, that consists in filing with the recorder a verified copy of the writing evidencing the condition, and of the veried statement, which should be either endorsed on

it, or should accompany it. But does not the evidence fail to prove that there was a compliance with that requirement? It seems so. It, also seems that there was no more substantial compliance with the statute than there was in the case of Cross against Carstens, supra.

As counsel did not argue these questions, I am willing to hear argument, by briefs, in a short time, if counsel desire, before announcing a definite conclusion. For the present, therefore, these observations questions, and inferences may be regarded as only impressions.

Since the foregoing opinion was delivered a brief in favor of Hoe & Co. has been handed in. The question is, what is the antecedent of the word "thereof?" And that was the question argued in the brief. The argument has not convinced me, that my first impressions of the meaning of the statute are erroneous. The antecedent of the word "thereof" is either the writing evidencing the condition, or the statement which was required to be endorsed thereon, or both. The contention of the brief is, that it means the writing evidencing the condition. To reach that conclusion considerations outside of the language of the legislature would have to guide and control, which is not allowable. Brinkerhoff J., in 18 Ohio St., 462.

Positive words in a statute are, unless there be decisive reasons which lead one to conclude otherwise, to be understood in their proper and most known signification. It is not necessarily the grammatical or etymological signification, but it is usually the vulgar signification, that which is most in use; "for use is the judge, the law, and the rule of speech." If the words are equivocal, to discover their true meanings, conjectures may be drawn from three sources, the subject, the effects and the circumstances. It is not safe to construe a law upon imputed motives which are not deduced from the interpretation of its text; because one may mold the motives so as to subserve his own interests and views.

No doubt the object of the statute in question was to give notice to third parties, who might deal with the property, of where the title is located. That is obvious on the surface of the statute. But I do not see why that notice may not just as effectually be given by a copy of the verified statement of the amount due, placed on the record, as by the original verified statement put on record.

It is a matter of arbitrary regulation. There are no reasons of policy or expediency why one mode should be adopted in preference to the other. The question is, which did the legislature intend to adopt? Punishment could be meted out for false swearing to the original statement endorsed on the original writing, as well as for also swearing to the statement on the copy of the writing evidencing the condition.

Finding the antecedent of the word "thereof," by jumping over what immediately preceded it in identifying it as the writing evidencing the condition, seems to me to be indefensible. It is taking an unwarranted liberty with the legislature's language. Governed by the rules for interpreting language, taking either the etymological, or the vulgar use of the words, it would be just as reasonable as the view of counsel for Hoe & Company, to say that the antecedent of the word "thereof" is the verified statement. It immediately precedes it; it is the nearest to it. That construction would elbow Hoe & Co's claim out of the case. But that is not the reasonable interpretation of the statute.

I shall adhere to the view that the words, "a true copy thereof," signify a true copy of the writing which evidences the condition, and of the verified statement endorsed thereon. In other words, the statute means that the seller, to preserve his title to the property against subsequent purchasers, etc., must deposit with the proper officer, either the original writing evidencing the condition and the original verified statement endorsed on it, or he must deposit a true copy of that original writing and statement, verified as such.

The statute declares that the verified statement must be "thereon," on the writing,— on the original writing, evidencing the condition. and not on a true copy of it. The brief for Hoe & Co. entirely ignores that command of the statute. The statute does not say that the verified statement may be put on a true copy of the writing evidencing the condition. But that is just what the brief contends for. Nor does the statute authorize any one to incorporate in the affidavit verifying the copy, a statement of the amount due. The statute is explicit as to the contents of the affidavit. It can simply affirm that the copy is a copy To affirm anything else is unwarranted by the statute. But that is the vice of the argument for Hoe & Co; for it claims that the affidavit may not only state that the copy is a true copy, but also, that it may, and for the first time, state the amount due.

It seems to me that the plain, explicit commands of the statute, (1) that the verified statement of the amount due must be endorsed "thereon," that it is on the original writing evidencing the condition, and (2) that when a true copy is deposited with the proper officers, the affidavit is only required to, and can only, contain an affirmation that the copy is a true copy, makes th artful and ingenious interpretation advocated by the brief for Hoe & Co. inadmissible and irrelevant.

Save and except the omission of essential words and the rhetorical infelicities of the statute, which I have already noted, the statute is too plain to permit construction, too positive to allow evasion and too clear to admit of doubt.

The findings and judgments of the master in the Supplemental Report are not obnoxious to the objection or exception interposed in my judgment. But the conclusions here announced will necessitate an order sustain-

ing the exceptions to his original report, which may be drawn.

G. B. Okey and George A. Fairbanks for plaintiff.

F. F. D. Albery for Parsons & Co.

J. F. Holmes for the Watertown Paper Co., and Morrell & Co.

Brown & Watson for Hoe & Co. McClure for Ostrander.

Hubbard for Cole, Trustee.